UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CONCERNED CITIZENS AROUND MURPHY,<br><br>*Plaintiff,*<br><br>v.<br><br>MURPHY OIL USA, INC.,<br><br>*Defendant.* | ) <br> ) Case No.: 08-4986 <br> ) Section: R <br> ) Judge: Vance <br> ) Division: 2 <br> ) Magistrate: Wilkinson <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY AND STANDING**

Plaintiff Concerned Citizens Around Murphy ("Concerned Citizens") respectfully submits this Memorandum in Support of its Motion for Partial Summary Judgment that Defendant Murphy Oil, U.S.A. ("Murphy") is liable for at least 24 violations of the Clean Air Act, and that Concerned Citizens has standing to prosecute this suit.

## INTRODUCTION

Murphy's own admissions in reports to the Louisiana Department of Environmental Quality ("LDEQ") show that Murphy repeatedly violates the Clean Air Act and has continued to violate the Act after the filing of this lawsuit. Because no genuine issue of material fact exists as

1

to the illegality of these emissions, Concerned Citizens respectfully moves for summary judgment that Murphy is liable for violating the Clean Air Act at least 24 times.

Concerned Citizens is also entitled to summary judgment that it has standing to prosecute this action because its members live and work near Murphy's Mereaux refinery and suffer harm to their quality of life because the Murphy refinery illegally emits excessive pollutants.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Murphy "may not rest upon . . . mere allegations or denials," but rather it "must set forth specific facts showing that there is a genuine issue of material fact for trial." Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Taita Chem. Co. v. Westlake Styrene Corp., 246 F.3d 377, 385 (5th Cir. 2001). Otherwise, summary judgment should be entered. See O'Hare v. Global Natural Res., Inc. 898 F.2d 1015, 1017 (5th Cir. 1990).

## BACKGROUND

### Facts

The law, facts, and evidence in this case are straightforward. With respect to liability, the relevant documents are 14 unauthorized discharge reports that Murphy submitted to LDEQ in which Murphy admitted to 24 violations in excess of its permitted levels at the Mereaux refinery. Exs. A-N. As Murphy has acknowledged, 20 of the unauthorized discharges that the reports describe were preventable. Additionally, Murphy does not claim that the remaining 4

unauthorized discharges were unpreventable.  These reports show that Murphy repeatedly violates the Clean Air Act.

With respect to standing, the declarations of Suzanne Kneale, William Green Jr., and John Dalier Jr. comprise the relevant summary judgment evidence. Exs. O-Q.  These declarations show that this lawsuit is germane to the purpose of Concerned Citizens to protect its members and other residents of St. Bernard Parish from pollution coming from the surrounding petrochemical industry.  Members of Concerned Citizens who live in the area surrounding the Murphy refinery suffer injury because they are forced to breathe polluted air.  This injury is fairly traceable to the Murphy refinery, which is directly adjacent to the affected community.  This Court has the power to redress plaintiff's injuries because civil penalties will deter future violations and an injunction will move Murphy toward compliance with the Clean Air Act.

**Law**

Congress enacted the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." St. Bernard Citizens for Environmental Quality, Inc. v. Chalmette Refining, L.L.C., 500 F. Supp.2d 592, 597 (E.D .La. 2007) (quoting 42 U.S.C. § 7401(b)(1)).  The Act establishes federal health protection standards for air pollution that states implement and enforce through state implementation plans and permits. Id.; 42 U.S.C. § 7410.  Louisiana's state implementation program requires permits for discharges of air pollutants. Chalmette Refining, 500 F. Supp at 598; La. R.S. § 30:2055.  LDEQ issues these permits in accordance with EPA-approved regulations. Chalmette Refining, 500 F. Supp at 598; La. R.S. § 30:2054.  As this Court has recognized, "[f]or entities regulated under the Clean Air Act, '[t]he burden is clearly on the source to do whatever is necessary to assure

3

compliance.'" Chalmette Refining, 399 F. Supp .2d at 730 (quoting 45 Fed. Reg. 59,874, 59,877 (Sept. 11, 1980)).

The Act's citizen suit provision grants citizens independent authority to enforce legal standards to protect their own health and welfare and to encourage government agencies to enforce the Act more vigorously. 42 U.S.C. § 7604; NRDC v. Train, 510 F.2d 692, 723 (D.C. Cir. 1975) ("Government initiative in seeking enforcement under the Clean Air Act has been restrained. Authorizing citizens to bring suits for violations of standards should motivate governmental agencies charged with the responsibility to bring enforcement and abatement proceedings.").

The citizen suit provision empowers citizens to act as private attorneys general in situations where governmental enforcers fail to diligently prosecute violators in court. 42 U.S.C. § 7604. Citizen suit authority extends to current violations and past violations where there is evidence that those violations were repeated. 42 U.S.C. § 7604(a)(1). Under Section 304(a) of the Act, citizens may sue for injunctive relief, for civil penalties payable to the U.S. Treasury, and for up to $100,000 in beneficial mitigation projects. 42 U.S.C. § 7604(g). Emission standards or limitations include, *inter alia*, any condition or requirement of a Clean Air Act permit, and any standard, limitation, or schedule established under subchapter V of the Clean Air Act or under Louisiana's plan for implementing the federal Clean Air Act. 42 U.S.C. § 7604(f).

**ARGUMENT**

I.  **MURPHY IS IN VIOLATION OF THE CLEAN AIR ACT.**

   A.  **Murphy's Discharges Exceed its Permit Limits.**

On numerous occasions since October 2003, Murphy has discharged dangerous pollutants in excess of its hourly and yearly permitted levels. This Summary Judgment Motion is about the following violations:

1. On April 30, 2004 Murphy emitted 43 pounds of hydrogen sulfide (H2S) from the #2 SRU Incinerator over 1.5 hours, polluting at 17,916.67% of the maximum hourly permit limit.[1]  Ex. A.

2. Also on April 30, 2004 Murphy emitted 243 pounds of sulfur dioxide ("SO2") from the #2 SRU Incinerator over 3 hours, polluting at 442.62% of the maximum hourly permit limit.[2]  Ex. A.

3. On June 28, 2006 Murphy emitted 319 pounds of SO2 from the #3 SRU Incinerator over 2 hours, polluting at 580.00% of the maximum hourly permit limit.[3]  Ex. B.

4. Also on June 28, 2006 Murphy emitted 29,513 pounds of SO2 from the South Flare over 2.5 hours, polluting at 2,333.04% of the maximum hourly permit limit.[4]  Ex. B.

5. On July 1, 2006 Murphy emitted 1,282 pounds of SO2 from the North Flare over .25 hours, polluting at 133,541.67% of the maximum hourly permit limit.[5]  Exs. C-1, C-2.

6. On July 10, 2006 Murphy emitted 2,755 pounds of SO2 from the North Flare over .6 hours, polluting at 119,574.65% of the maximum hourly permit limit.[6]  Exs. D-1, D-2.

---

[1] The referenced permit limit can be found on page 246 of Murphy's V1 operating permit. Murphy's V1 operating permit may be found on LDEQ's website at http://edms.deq.louisiana.gov/app/doc/view.aspx?doc=27081136&child=yes.
[2] The referenced permit limit can be found on page 115 of Murphy's V1 operating permit.
[3] The referenced permit limit can be found on page 228 of Murphy's V1 operating permit.
[4] The referenced permit limit can be found on page 165 of Murphy's V1 operating permit.
[5] The referenced permit limit can be found on page 134 of Murphy's V1 operating permit.

7. Also on July 10, 2006 Murphy emitted 205 pounds of SO2 from the #2 SRU Incinerator over 2.9 hours, polluting at 386.28% of the maximum hourly permit limit.[7] Exs. D-1, D-2.

8. On August 6, 2006 Murphy emitted 501 pounds of SO2 from the North Flare over 8.5 hours, polluting at 1,534.93% of the maximum hourly permit limit.[8] Exs. E-1, E-2.

9. On August 16, 2007 Murphy emitted 1,031 pounds of SO2 from the #3SRU Incinerator over 5.5 hours, polluting at 681.65% of the maximum hourly permit limit.[9] Ex. F.

10. Also on August 16, 2007 Murphy emitted 261 pounds of SO2 from the North Flare over .5 hours, polluting at 13,593.75% of the maximum hourly permit limit.[10] Ex. G.

11. On January 20, 2008 Murphy emitted 51 pounds of H2S from the #3 SRU Incinerator over 1 hour, polluting at 5,100.00% of the maximum hourly permit limit.[11] Ex. H.

12. On January 29, 2008 Murphy emitted 43 pounds of oxides of nitrogen ("NOX") from the North Flare over .25 hours, polluting at 11,543.62% of the maximum hourly permit limit.[12] Exs. I-1, I-2.

13. Also on January 29, 2008 Murphy emitted 308 pounds of volatile organic compounds ("VOC's") from the North Flare over .25 hours, polluting at 40,261.44% of the maximum hourly permit limit.[13] Exs. I-1, I-2.

14. On August 16, 2008 Murphy emitted 447 pounds of SO2 from the North Flare over .25 hours, polluting at 288,387.10% of the maximum hourly permit limit.[14] Ex. J.

---

[6] The referenced permit limit can be found on page 134 of Murphy's V1 operating permit.
[7] The referenced permit limit can be found on page 115 of Murphy's V1 operating permit.
[8] The referenced permit limit can be found on page 134 of Murphy's V1 operating permit.
[9] The referenced permit limit can be found on page 228 of Murphy's V1 operating permit.
[10] The referenced permit limit can be found on page 134 of Murphy's V1 operating permit.
[11] The referenced permit limit can be found on page 73 of Murphy's V2 operating permit. Murphy's V2 operating permit may be found on LDEQ's website at http://edms.deq.louisiana.gov/app/doc/view.aspx?doc=36427641&child=yes. (EQT 0079; emission point IDs can be found on pages 51-53 of the V2 operating permit)
[12] The referenced permit limit can be found on page 61 of Murphy's V2 operating permit. (EQT 0035)
[13] The referenced permit limit can be found on page 61 of Murphy's V2 operating permit. (EQT 0035)

15. Also on August 16, 2008 Murphy emitted 39 pounds of SO2 from the #2 SRU Incinerator over .5 hours, polluting at 426.23% of the maximum hourly permit limit.[15] Ex. J.

16. Also on August 16, 2008 Murphy emitted 6,252 pounds of SO2 from the North Flare over .5 hours, polluting at 2,016,774.19% of the maximum hourly permit limit.[16] Ex. J.

17. Also on August 16, 2008 Murphy emitted 3,160 pounds of SO2 from the South Flare over .5 hours, polluting at 1,248.72% of the maximum hourly permit limit.[17] Ex. J.

18. Also on August 16, 2008 Murphy emitted 4,000 pounds of SO2 from the North Flare over .5 hours, polluting at 1,290,322.58% of the maximum hourly permit limit.[18] Ex. J.

19. Also on August 16, 2008 Murphy emitted 10,698 pounds of SO2 from the North Flare, polluting at 254.71% of the **yearly** permit limit in one day alone.[19] Ex. J.

20. On August 19, 2008 Murphy emitted 1,700 pounds of SO2 from the #3 SRU Incinerator over 16.25 hours, polluting at 190.21% of the maximum hourly permit limit.[20] Exs. K-1, K-2.

Additionally, Murphy has continued to violate the Clean Air Act after filing of this lawsuit, including without limitation:

21. On November 22, 2008 Murphy emitted 1 pound of Benzene from Tank 300-2 over 24 hours, polluting at 416.67% of the maximum hourly permit limit.[21] Ex. L.

---

[14] The referenced permit limit can be found on page 57 of Murphy's V3 operating permit. Murphy's V3 operating permit may be found on LDEQ's website at http://edms.deq.louisiana.gov/app/doc/view.aspx?doc=36854744&child=yes. (EQT 0035)
[15] The referenced permit limit can be found on page 56 of Murphy's V3 operating permit. (EQT 0019)
[16] The referenced permit limit can be found on page 57 of Murphy's V3 operating permit. (EQT 0035)
[17] The referenced permit limit can be found on page 57 of Murphy's V3 operating permit. (EQT 0049)
[18] The referenced permit limit can be found on page 57 of Murphy's V3 operating permit. (EQT 0035)
[19] The referenced permit limit can be found on page 57 of Murphy's V3 operating permit. (EQT 0035)
[20] The referenced permit limit can be found on page 58 of Murphy's V3 operating permit. (EQT 0079)

22. Also on November 22, 2008 Murphy emitted 500 pounds of VOC's from Tank 300-2 over 24 hours, polluting at 1,627.60% of the maximum hourly permit limit.[22]  Ex. L.

23. On January 9, 2009 Murphy emitted 235 pounds of SO2 from the South Flare over 1 hour, polluting at 6,317.20% of the average hourly permit limit.[23]  Ex. M.

24. On January 13, 2009 Murphy emitted 215 pounds of SO2 from the North Flare over 1.25 hours, polluting at 27,741.94% of the maximum hourly permit limit.[24]  Ex. N.

Murphy is therefore liable for violating the Clean Air Act at least 24 times which resulted in the emission of more than 50,000 pounds[25] of toxic pollutants into the community's air.

### B. Murphy's Unauthorized Discharges Violate the Act.

Any discharge of "air contaminants . . . into the air of this state in violation of regulations of the secretary or the terms of any permit, license, or variance" is unlawful.  La. R.S. § 30:2057. EPA has explained, "excess emissions might aggravate air quality so as to prevent attainment or interfere with maintenance of the ambient air quality standards."  EPA, Memorandum on State Implementation Plans:  Policy Regarding Excess Emissions During Malfunctions, Startup, and Shutdown, 1 (Sept. 20, 1999). Therefore, "*all* excess emissions [are] violations of the applicable emission limitation" even when excess emissions are caused by equipment breakdowns.  Id (emphasis added).   As noted above, Murphy's duty under the Clean Air Act is to "do whatever is necessary to assure compliance."  Chalmette Refining, 399 F. Supp .2d at 730 (internal quotation marks and citation omitted).

---

[21] The referenced permit limit can be found on page 64 of Murphy's V3 operating permit.  (EQT 0051)
[22] The referenced permit limit can be found on page 57 of Murphy's V3 operating permit.  (EQT 0051)
[23] The referenced permit limit can be found on page 57 of Murphy's V3 operating permit.  (EQT 0049)
[24] The referenced permit limit can be found on page 57 of Murphy's V3 operating permit.  (EQT 0035)
[25] This number is the summation of the discharges enumerated above (except for the discharges described in violation 19, which is a yearly-permit violation).

8

Under Louisiana's plan for implementing the Clean Air Act, Murphy must file a written report with LDEQ each time the refinery has an "unauthorized discharge." La. Admin. Code tit. 33, § III.927.A. An "unauthorized discharge" is "a continuous, intermittent, or one-time discharge, whether intentional or unintentional, anticipated or unanticipated, from any permitted or unpermitted source which is in contravention of any provision of the Louisiana Environmental Quality Act (La. R.S. § 30:2001 et seq.) or of any permit . . . ." La. Admin Code tit. 31 § I.3905. By filing these unauthorized discharge reports, Murphy admits violations of an "emission standard or limitation." See La. Admin. Code tit. 33 § III.927.A; CAA § 304(f), 42 U.S.C. § 7604(f).

Murphy repeatedly violates the Clean Air Act and has reported at least 24 violations. Exs. A-N. These unauthorized discharges resulted in the emission of over 50,000 pounds of pollutants, including pollutants that EPA classifies as "Extremely Hazardous Substances," into the air in the plaintiff's community.[26]

**C. No Affirmative Defense Can Excuse Murphy's 24 Excess Emissions.**

For this Motion, the Plaintiff conservatively selected violations to avoid any disputes of fact relating to the so-called "upset" defense. See Chalmette Refining, 354 F. Supp 2d at 706 ("a state's implementation plan may provide an affirmative defense for permit violations caused by circumstances beyond the control of the owner or operator [*i.e*., upsets], that defense will apply only to 'malfunctions'. . . . '[A]ny other preventable upset condition or preventable equipment breakdown' cannot be considered malfunctions.") (internal citation omitted). In its unauthorized discharge reports, Murphy must inform LDEQ whether an unauthorized discharge was

---

[26] EPA lists Extremely Hazardous Substances at 40 C.F.R. pt. 355 app. A. The Extremely Hazardous Substance list "was established by EPA to identify chemical substances which could cause serious irreversible health effects from accidental releases." Extremely Hazardous Substances List, 72 Fed. Reg. 65,462 (Nov. 3, 2003). Murphy emits Extremely Hazardous Substances including hydrogen sulfide, sulfur dioxide, nitric oxide, and benzene.

9

preventable or not.[27] Murphy did not identify any of the violations at issue in this Motion as "preventable." In addition, the Plaintiffs reserve the right, in later motions or at trial, to identify other emission incidents to which this defense should not apply. For this reason, the Plaintiff provides some supplemental information about the upset defense below.

The so-called "upset" defense must be read narrowly because it conflicts with the unambiguous requirement of the Clean Air Act that emission standards be applied "on a continuous basis." 42 U.S.C. § 7602(k) (defining the term "emission limitation" for purposes of the entire Act). See Sierra Club v. EPA, 551 F.3d 1019, 1028 (D.C. Cir. 2008) (overturning EPA's exemption for "startup, shutdown, and malfunctions" (SSM) in the context of hazardous air pollutant standards because "the SSM exemption violates the CAA's requirement that some section 112 standard apply continuously.") Louisiana's provision for a defense for "upsets" applies only to "technology based standards." La. Admin. Code 33:III.507(J). The defendant has the burden of proving the several elements of the upset defense, including for example, that the defendant "can identify the cause(s) of the upset," that the defendant was "properly operat[ing]" its facility at the time of the incident, and that the defendant took "all reasonable steps to minimize levels of emissions that exceeded the emissions standards and other requirements in the permit. Further, EPA guidance provides that any such affirmative defense may only apply to actions for civil penalties, not injunctive relief.[28]

At any rate, with respect to the 24 emission incidents that are the subject of this Motion, Murphy has admitted that 20 of the 24 discharges were preventable, and has not claimed the four

---

[27] La. Admin. Code tit. 33 § I.3925(B)(14) and 33 § I.3917(A) require that Murphy inform LDEQ whether an authorized discharge was preventable or not if the discharge caused an emergency condition or if the discharge exceed a specified reportable quantity. Four of the violations at issue in this motion did not exceed the reportable quantity for the emitted pollutant thus Murphy has not specified whether those violations were preventable or not.
[28] EPA, State Implementation Plans: Policy Regarding Excess Emissions During Malfunctions, Startup, and Shutdown (Sept. 20, 1999), available at http:// www.epa.gov/ttn/nsr/gen/excessem.pdf

post-complaint violations were unpreventable. Exs. A-N. For that reason, it is beyond dispute that the "upset" defense does not apply to these 24 violations.

## II. CONCERNED CITIZENS AROUND MURPHY HAS STANDING TO ENFORCE ITS RIGHTS UNDER THE CLEAN AIR ACT.

### A. No genuine issue of material fact exists regarding whether Concerned Citizens has standing to bring this citizens suit under the Clean Air Act.

Concerned Citizens seeks Summary Judgment that it has standing to bring this suit. Murphy's violations injure them, and it is within this Court's power under the Clean Air Act to appropriately redress these injuries. Under Article III of the Constitution, standing requires that plaintiffs "have a direct stake in the outcome" of lawsuits and that courts issue rulings in the context of concrete disputes, as opposed to mere advisory rulings. Sierra Club v. Morton, 405 U.S. 727, 740 (1972). To establish standing, the Court must determine whether plaintiff has 1) suffered an "injury in fact," 2) that is fairly traceable to the challenged action of the defendant;" and 3) that will likely be "redressed by a favorable decision." Friends of the Earth v. Laidlaw Envtl. Serv., 528 U.S. 167, 180-81 (2000).

For environmental citizen suits, "[t]he relevant showing for purposes of Article III standing…is not injury to the environment but injury to the plaintiff." Laidlaw, 528 U.S. at 181. An "injury in fact" need not be physical or economic; the Supreme Court has held that in environmental cases plaintiffs may allege injury based on "aesthetic" or "recreational" injuries. Laidlaw, 528 U.S. at 183. Thus, in Chalmette Refining, this Court held that "plaintiffs need not show … that they suffer a bodily injury caused by the pollution. Rather, plaintiffs can demonstrate a cognizable injury by showing that they breathe and smell polluted air." 354 F. Supp. 2d at 702; see also Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum

11

Corp., 207 F.3d 789, 792 (5th Cir. 2000) (quoting NRDC v. EPA, 507 F.2d 905, 910 (9th Cir. 1974).

Chalmette Refining involved facts analogous to this case: a citizens group sought to enforce the Clean Air Act on behalf of its members and alleged that an oil refinery's emissions violated the law. 354 F. Supp. 2d at 699. In Chalmette, this Court concluded that "[o]rganizations . . . have standing to bring a suit on behalf of their members if: 1) their members would have standing to sue in their own right; 2) the interests they seek to protect are germane to their purpose as an organization; and 3) neither the claim asserted, nor the relief requested, requires participation of the individual members." Id. at 700; see also Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). Concerned Citizens meets all standing requirements to bring suit on behalf of its members.

B. **Because Members of Concerned Citizens Breathe and Smell Polluted Air from Murphy's Refinery, They Suffer Actual and Threatened Injuries.**

Members of Concerned Citizens own, rent, and live in homes throughout Chalmette, Louisiana, but Murphy impairs their use and enjoyment of the ambient air in this area by failing to comply with permit limits. Ex. O-1 (Kneale Decl.) at ¶¶ 9, 12, 13; Ex. P-1 (Green Decl.) at ¶ 8; Ex. Q-1 (Dalier Decl.) at ¶¶ 6, 9.

In Chalmette, this Court followed Supreme Court precedent that "environmental plaintiffs demonstrate injury-in-fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." 354 F. Supp. 2d at 702 (internal quotation marks omitted) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Services, Inc., 528 U.S. 167, 183 (2000)).

Here, in their declarations, members of Concerned Citizens state that they "often smell noxious and chemical odors coming from Murphy" that smell like "sulfur" and "petroleum". Ex.

12

O-1 (Kneale Decl.) at ¶ 5; <u>see also</u> Ex. P-1 (Green Decl.) at ¶ 9 (noting a "sour" smell); Ex. Q-1 (Dalier Decl.) at ¶ 7 (noting a "rotten eggs" odor). During an incident on August 16, 2008, Ms. Kneale testified that she and her son "wished to throw the football in the yard, and would have done so." They were denied the pleasure of that activity, however, because "[t]he odors from Murphy Oil . . . made it unpleasant to be outside in the yard, and for that reason, we did not throw the football." Ex. O-1 [(Kneale Decl.) at ¶ 8.

In March of 2009, Concerned Citizens President Bill Green hosted his family in from Dallas. When they arrived, Mr. Green said that the odor emanating from the Murphy Refinery was so strong that his family declined to leave the car. "As soon as we opened the van door, [my granddaughter and her friend] both said, 'Oh, Papa, it stinks,'" Mr. Green said. "They wouldn't get out of the van. They stayed in the van while we went in the garage. So that concerns me." Ex. P-2 (Green Deposition)] at 68. These examples are illustrative of the injuries Concerned Citizens members suffer as a result of Murphy's failure to comply with the Clean Air Act.

C. **Concerned Citizens' Injuries Are Fairly Traceable to Murphy's Conduct.**

Concerned Citizens declarants testify about occasions in which they smelled odors and contemporaneously saw emissions coming from Murphy. On August 16, 2008, Ms. Kneale "witnessed huge flames coming out of Murphy." <u>See</u> Ex. O-1 (Kneale Decl.) at ¶ 8. On that day, Murphy violated its permit six times, including an exceedence of a yearly permit limit on that day alone (see violations 14-119, supra). Mr. Dalier said, "I know the nauseating odors come from Murphy Oil because I sometimes see black smoke emanating from the refinery at the same time I smell the odors." Ex. Q-1 (Dalier Decl.) at ¶¶ 7, 10. Members state that they "know that the . . . odors come from Murphy Oil." Ex. O-1 (Kneale Decl.) at ¶ 11; Ex. P-1 (Green Decl.) at ¶ 9; Ex. Q-1 (Dalier Decl.) at ¶ 7. Mr. Dalier noted that he "see[s] black smoke emanating from the

13

[Murphy] refinery at the same time" he smells odors. Id. Therefore, Concerned Citizens has shown that its members' injuries are fairly traceable to Murphy's Clean Air Act violations. Chalmette Refining, 354 F. Supp. 2d at 703 (holding that "(1) plaintiffs' testimony that they observed smoke from the defendant's plant in their neighborhood at the same time that they smelled chemical odors; [and] (2) evidence that the odors were present during admitted process upsets" satisfy the fairly traceable standard.

D. **This Court Can Redress the Injuries that Concerned Citizens' Members Suffer.**

The Clean Air Act grants this Court authority to redress Plaintiff's injuries by means of an injunction and civil penalties against the violating party. CAA § 304, 42 U.S.C. § 7604; see Chalmette Refining, 354 F. Supp. 2d at 704-706. In addition, the Court may order the defendant to undertake beneficial mitigation projects in lieu of some part of a civil penalties award. CAA § 304(g)(2), 42 U.S.C. § 7604(g)(2).

E. **The Interests that Concerned Citizens Seeks To Protect By This Lawsuit Are Germane to its Organizational Purposes.**

The interests that Concerned Citizens seeks to protect by this lawsuit are directly tied to its purpose as an organization. Concerned Citizens is "committed to protecting the organization's members and other St. Bernard Parish residents from pollution coming from the surrounding petrochemical industry," and it "seeks to affect the decisions that impact its community by encouraging citizen participation and providing advocacy for all residents who are committed to return, rebuild and remain in St. Bernard Parish, Louisiana." Ex. O-1 (Kneale Decl.) at ¶ 4.

F. **Neither the Claim Asserted Nor the Relief Sought Requires Participation of Individual Members of Concerned Citizens.**

Because this action does not seek monetary damages or particularized relief limited to a single person or group, it does not require the participation of individual members of Concerned

Citizens as parties. See Hunt, 432 U.S. at 334. Therefore, no genuine issue of fact remains as to whether the claims asserted or relief requested can be "'properly resolved in a group context.'" Chalmette Refining, 354 F. Supp. 2d at 701 (quoting Hunt, 432 U.S. at 334). They can.

Therefore, Concerned Citizens has standing to enforce its rights under the Clean Air Act.

## PRAYER

Concerned Citizens Around Murphy respectfully prays that the Court grant Summary Judgment that Murphy Oil, U.S.A. is liable for at least 24 violations of the Clean Air Act and that Concerned Citizens has standing to prosecute this suit.

Respectfully submitted on October 29, 2009.

s/ Matthew Altaras
_____
Matthew Altaras, Student Attorney

s/ Matthew B. Miller
_____
Matthew B. Miller, Student Attorney

s/ Adam Babich
_____
Adam Babich, La. Bar No. 27177
Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, LA 70118-6321
Phone: (504) 865-5789; direct dial 862-8800
Fax: (504) 862-8721
Counsel for Concerned Citizens Around Murphy

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon counsel of record by electronic means on October 29, 2009.

s/ Adam Babich
_____
Adam Babich, SBN: 27177