UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CONCERNED CITIZENS AROUND                    CIVIL ACTION
MURPHY

VERSUS                                       NO: 08-4986

MURPHY OIL USA, INC.                         SECTION: R(2)


## ORDER AND REASONS

Before the Court are plaintiff Concerned Citizens Around
Murphy (CCAM)'s First Motion for Partial Summary Judgment on
Liability and Standing (*see* R. Doc. 30), and defendant Murphy Oil
USA, Inc. (Murphy)'s Motion for Partial Summary Judgment on
Standing (*see* R. Doc. 41). CCAM's motion is GRANTED in part and
DENIED in part, and Murphy's motion is DENIED.


## I.    BACKGROUND

CCAM, a Louisiana non-profit organization, brought this
action on behalf of its members under the citizen suit provision
of the Clean Air Act, 42 U.S.C. § 7604(a). CCAM alleges that

Murphy repeatedly violated hourly and yearly emission limitations set by the Louisiana Department of Environmental Quality (LDEQ), and also that Murphy failed to properly maintain certain pollution control devices. CCAM alleges that these violations endanger the health and impair the quality of life of its members who live or own property near Murphy's Meraux refinery in St. Bernard Parish, Louisiana. CCAM requests a declaration that Murphy has committed these violations, a permanent injunction requiring Murphy to comply with applicable permits and the Clean Air Act, civil penalties and attorney's fees. *See* 42 U.S.C. § 7604.

CCAM now moves for partial summary judgment on liability and standing. Murphy also moves for partial summary judgment on standing. The Court heard oral argument on the parties' motions on December 9, 2009 and ordered supplemental briefing. For the following reasons, CCAM's motion is GRANTED IN PART and DENIED IN PART, and Murphy's motion is DENIED.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. V. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

3

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith for and on Behalf of Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

## III. DISCUSSION

Congress created the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1). The Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, is a comprehensive program for controlling and improving the nation's air quality. Under the Act, the Environmental Protection Agency identifies air pollutants that endanger the public health or welfare, determines what concentrations of those pollutants are safe, and promulgates

those determinations as national ambient air quality standards (NAAQS), national emissions standards for hazardous air pollutants (NESHAPs), and new source performance standards (NSPS). *See* 42 U.S.C. §§ 7408, 7409, 7411, 7412. Each state must ensure that its ambient air meets the appropriate NAAQS, *see* 42 U.S.C. §§ 7407(a), and must develop a state implementation plan to achieve the standards established by the EPA, *see* 42 U.S.C. § 7410(a). The Act requires state implementation plans to include "enforceable emission limitations and other control measures, means, or techniques . . ., as well as schedules and timetables for compliance" to meet the NAAQS. 42 U.S.C. § 7410(a)(2)(A). The Act also permits states to set additional or higher emission standards in its plan. *See* 42 U.S.C. § 7416. Louisiana's plan requires permits for discharges of various air pollutants. La. Rev. Stat. Ann. § 30:2055. The Secretary of the LDEQ issues permits in accordance with federal and state law and LDEQ regulations. La. Rev. Stat. Ann. § 30:2054. The LDEQ has issued three relevant permits setting emission limitations for Murphy's Meraux refinery.[1]

---

[1] *See* La. Dep't of Envtl. Quality Operating Permit No. 2500-000001-V1 (Feb. 8, 2002) ("LDEQ Permit V1"), *available at* http://edms.deq.louisiana.gov/app/doc/view.aspx?doc=27081136&chil d=yes; La. Dep't of Envtl. Quality Operating Permit No. 2500-000001-V2 (Nov. 21, 2007) ("LDEQ V2 Permit"), *available at* http://edms.deq.louisiana.gov/app/doc/view.aspx?doc=36427641&chil

The Clean Air Act includes a citizen suit provision that allows citizens to request injunctive relief and civil penalties, payable to the United States Treasury, for the violation of any "emission standard or limitation" under the Act.  42 U.S.C. § 7604(a).  CCAM sues Murphy under this citizen suit provision for violating the emission limitations set by its LDEQ Permits.

**A.    Standing**

Both CCAM and Murphy move for summary judgment on the issue of whether CCAM has standing to bring this action under the Clean Air Act.  The Clean Air Act's citizen suit provision authorizes "any person" to "commence a civil action on his own behalf against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emissions standard or limitation under this chapter . . . ."  42 U.S.C. § 7604(a).  Congress defined the term "person" to include corporations, partnerships and associations.  *See* 42 U.S.C. § 7602(e).  It is clear that nonprofit corporations may invoke the Clean Air Act's citizen suit provision.  *See, e.g.*, *Texans United for a Safe Econ. Educ.*

_____

d=yes; La. Dep't of Envtl. Quality Operating Permit No. 2500-000001-V3 (May 8, 2008) ("LDEQ V3 Permit"), *available at* http://edms.deq.louisiana.gov/app/doc/view.aspx?doc=36854744&child=yes.

*Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir.

2000); *St. Bernard Citizens for Environ. Quality, Inc. v.

Chalmette Refining, L.L.C.*, 354 F. Supp. 2d 697, 700 (E.D. La.

2005). CCAM alleges that Murphy has repeatedly violated its LDEQ

emission limitations. Accordingly, if CCAM has standing to bring

this action under Article III of the Constitution, it also has

statutory standing under the Clean Air Act. *See Ecological

Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1147 (5th

Cir. 2000); *Middlesex County Sewerage Auth. v. Nat. Sea Clammers

Ass'n*, 453 U.S. 1, 16 (1981).

Thus, the Court must determine whether CCAM has

constitutional standing to bring this citizen suit. The standing

issue is a threshold matter. *Texans United*, 207 F.3d at 792.

The requirement that a party have standing flows from the Article

III requirement that there be a "case or controversy." U.S.

Const. art. III, § 2, cl. 1. Standing analysis focuses on

whether "a party has a sufficient stake in an otherwise

justiciable controversy to obtain judicial resolution of that

controversy." *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972).

To prevail on a summary judgment motion, the plaintiff may not

rest on mere allegations to support standing, but it instead must

produce affidavits or other evidence to prove that standing

exists. *See Gladstone Realtors v. Village of Bellwood*, 441 U.S.

7

91, 115 n.31 (1979).

In this suit, CCAM seeks to represent the interests of its members. An organization like CCAM has standing to bring a suit on behalf of its members if: (1) its members would have standing to sue in their own right; (2) the interests its seeks to protect are germane to its purpose as an association; and (3) neither the claim it asserts, nor the relief it requests, requires the participation of individual members. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Texans United*, 207 F.3d at 792. The parties dispute all three of these requirements. The Court finds that there is no genuine issue of material fact that CCAM satisfies all three requirements under Fifth Circuit law.

1. CCAM's individual members would have standing to sue in their own right.

To prevail on its motion for summary judgment on standing, CCAM must show that there is no genuine issue of material fact that: (1) its members have suffered an actual or threatened injury; (2) the injury is "fairly traceable" to the defendant's actions; and (3) the injury likely will be redressed if CCAM prevails in the lawsuit. *Texans United*, 207 F.3d at 792. CCAM has made this showing.

### (a) Injury-in-Fact

CCAM relies on the affidavits of Suzanne Kneale (R. Doc. 30, Ex. O-1), John Dalier, Jr. (R. Doc. 30, Ex. Q-1) and William Green, Jr. (R. Doc. 30, Ex. P-1), as well as the deposition transcript of William Green, Jr. (R. Doc. 30, Ex. P-2), to demonstrate that its members have suffered injury-in-fact.

According to her declaration, Kneale has lived seven blocks west of Murphy's Meraux refinery at 2114 Corinne Drive, Chalmette, Louisiana since 1993. (*Id.* ¶ 7.) She joined CCAM in May 2007 and has served as its Secretary since that date. (R. Doc. 30, Ex. O-1 ¶ 2.) She asserts that the "frequent obnoxious and chemical odors from Murphy Oil" diminish her enjoyment of her property (*id.* ¶ 10), and the odors "significantly impair [her] quality of life" (*id.* ¶¶ 10, 13). For example, Kneale says she enjoys walking in her neighborhood but sometimes does not because of the odors outside. (*Id.*) She states that she would walk more frequently but for the odors. (*Id.*) She recounts that on August 16, 2008, she wanted to throw a football with her son in her yard and would have done so but for the unpleasant odors emanating from the refinery. (*Id.* ¶ 8.) Kneale reports frequent headaches when the chemical odors from Murphy are strong (*id.*), and says that the sour odors burn [her] nasal passages." (*Id.* ¶ 9.) She avers that the smells from Murphy's refinery cause her to worry

about her and her family's well-being.  (*Id.* ¶¶ 10, 13.)

According to Dalier's declaration, Dalier has lived a few blocks west of Murphy's Meraux refinery at 2612 Campagna Drive in Chalmette, Louisiana since 2006.  (R. Doc. 30, Ex. Q-1 ¶ 3.)  He has been a member of CCAM since "around" its inception in 2007. (*Id.* ¶ 2.)  Dalier avers that he "often smell[s] noxious and chemical odors coming from Murphy Oil," and these odors "impair [his] ability to enjoy the community, and [his] quality of life." (*Id.* ¶ 5-6.)  Were it not for the odors from Murphy's refinery, Dalier says that he "would go outside more."  (*Id.* ¶ 6.)  He enjoys "playing with [his] dog, but sometimes the odors coming from the Murphy Oil refinery are so strong that [he] is unable to do so."  (*Id.*)  He further avers that "[t]he odors cause [him] to worry about the community's health and well-being, as well as [his] own."  (*Id.*)  Dalier reports noticing "particulates coming from Murphy Oil."  (*Id.* ¶¶ 8-9.)  He worries that the "dust-like particles" coming from Murphy "are affecting my truck, because the exterior paint on the roof of my truck is fading."  (*Id.* ¶ 9.)  He avers that the particulates also cause him to worry about his and his community's health.  (*Id.* ¶ 9.)  He remains indoors on days when he notices "black billowy fumes coming from Murphy Oil."  (*Id.* ¶ 9.)

According to Green's revised declaration, he has owned a

home located two streets west of Murphy's Meraux refinery at 2308 Despaux Drive in Chalmette, Louisiana since 1969. (R. Doc. 30, Ex. P-1 ¶ 4.) Although he currently lives with his sister in New Orleans East because his home was damaged by Hurricane Katrina, Green is "still actively engaged in rebuilding [his] home in Chalmette." (*Id.*) He has been a member of CCAM since around its inception and has served as President since July 7, 2008. (*Id.* ¶ 2.) Green avers that odors from Murphy's refinery sometimes diminish his enjoyment of his property and cause him to worry about his, his family's and his community's well-being. (*Id.* ¶ 8.) The odors "sometimes prevent [him] from having coffee breaks outside with neighbors." (*Id.*) He reports that his six-year old granddaughter once visited him at his home in Chalmette but refused to get out of the van and stated, "Oh, Papa, it stinks." (R. Doc. 30, Ex. P-2 at 67:21-68:6.)

CCAM argues that this evidence demonstrates that its members' enjoyment of their surroundings has been diminished, and that therefore they have demonstrated a cognizable injury-in-fact. Murphy argues that Dalier and Green have failed to connect their alleged injuries to any of the particular permit violations at issue in this case, and that "it is highly unlikely" that the permit violations identified by Kneale "presented a health concern or resulted in injury from either breathing or smelling

11

polluted air on these two specific dates." (R. Doc. 41 at 16 (citing R. Doc. 41, Ex. H ¶¶ V.C-V.D.).)

Murphy's contentions are without merit. First, that Dalier and Green do not identify specific dates of their injuries may be relevant to whether their injuries are "fairly traceable" to Murphy's permit violations, but this is not relevant to the preliminary question of whether they have suffered injury-in-fact. Second, the Supreme Court has held that environmental plaintiffs demonstrate injury-in-fact when they aver that their "reasonable concerns" about the effects of discharges have "directly affected" their recreational, aesthetic, and economic interests. *Friends of the Earth, Inc. v. Laidlaw Envtl. Services, Inc.*, 528 U.S. 167, 183-84 (2000); *see also Covington v. Jefferson County*, 358 F.3d 626, 639 (9th Cir. 2004); *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 518 (4th Cir. 2003).

In *Laidlaw*, the Supreme Court found injury-in-fact in a Clean Water Act case based on an affidavit from an individual who averred that "he lived a half-mile from the defendant's facility; . . . he occasionally drove over the North Tyger River, and . . . it looked and smelled polluted"; and he would have used the river more often but for his concern that the water was polluted. 528 U.S. at 181-82. Furthermore, the Fifth Circuit has relied on authority holding that "breathing and smelling

12

polluted air is sufficient to demonstrate injury-in-fact and thus confer standing under the CAA." *See Texans United*, 207 F.3d at 792 (citing *NRDC v. EPA*, 507 F.2d 905, 910 (9th Cir. 1974)). In *Texans United*, the Fifth Circuit found that plaintiffs satisfied the injury-in-fact requirement when they stated in affidavits that they suffered repeated exposure to sulfurous odors while in their homes and yards. *Id*.

Thus, CCAM's members need not show that they suffer adverse "health effects" caused by Murphy's pollution. (*See* R. Doc. 41, Ex. H ¶¶ II.B, VIII.A.) Rather, they may demonstrate a cognizable injury by showing that breathing, smelling and being reasonably concerned about the health effects of polluted air diminish their use and enjoyment of their property. *Id.; Communities for a Better Env't v. Cenco Refining Co.*, 180 F. Supp. 2d 1062, 1074-75 (C.D. Cal. 2001). Kneale, Dalier and Green have made this showing: they use and enjoy their yards and neighborhood less because of odors emanating from Murphy's refinery. Although Green presently lives in New Orleans East, his declaration states that he is actively engaged in rebuilding his home in Chalmette and that odors from Murphy's refinery interfere with this activity. For the foregoing reasons, the Court concludes that CCAM has satisfied the injury-in-fact requirement for standing.

### (b) "Fairly Traceable"

CCAM asserts that the affidavits of Kneale, Dalier and Green establish that their injuries are fairly traceable to Murphy's emissions.  All three individuals are able to trace the pollution they smell to Murphy because the odors grow stronger when they get closer to the refinery.  (R. Doc. 30, Ex. O-1 ¶ 11, P-1 ¶ 4, Q-1 ¶ 7.)  All three report that the smell grows stronger when they are downwind from Murphy's refinery.  (R. Doc. 30, Ex. O-1 ¶ 11, P-1 ¶ 4, Q-1 ¶ 5.)  Kneale states that often when she smells odors she learns that Murphy had an "upset" at approximately the same time.  (R. Doc. 30, Ex. O-1 ¶ 11.)  Green asserts that he has worked in refineries and recognizes the odors.  (R. Doc. 30, Ex. P-1 ¶ 4.)  Dalier avers that he sometimes observes black smoke emanating from the refinery at the same time he smells the odors.  (R. Doc. 30, Ex. Q-1 ¶ 7.)  He also asserts that he has witnessed particulates emanating from the stacks at Murphy's refinery, an observation that he says has been confirmed by the Louisiana Department of Environmental Quality.  (R. Doc. 30, Ex. Q-1 ¶ 10.)

Murphy does not deny that disagreeable odors and particulates emanate from its refinery.  It argues, however, that the specific injuries alleged by CCAM's members are not fairly traceable to particular permit violations on those dates.

Specifically, Murphy's argument rests on an expert report purporting to establish that on January 2, 2008 and August 16, 2008 (both days of admitted permit violations), ambient concentrations of nitrogen oxides (NOx) and sulfur dioxide (SO2) at CCAM's members' homes "were significantly lower than the lowest reported odor thresholds for" these compounds. (*See* R. Doc. 41, Ex. H at 15.) In essence, Murphy argues that whatever injury CCAM's members sustained on those two days, the odor was not attributable to the admittedly unlawful discharge of NOx and SO2.

Murphy's argument is wide of the mark. First, CCAM need not pinpoint the exact times of violations and link its members' injuries to permit violations at those times. *See Texans United*, 207 F.3d at 792-93. Second, Murphy conflates the issue of standing with causation. *See id.; Public Interest Research Group, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 63, 72 (3d Cir. 1990) (finding that the "fairly traceable" requirement "is not equivalent to a requirement of tort causation"), *cert. denied*, 498 U.S. 1109 (1991). CCAM may satisfy the traceability requirement by presenting only circumstantial evidence that a "pollutant causes or *contributes to* the kinds of injuries alleged." *Comer v. Murphy Oil USA*, 585 F.3d 855, 866 (5th Cir. 2009) (rejecting argument that traceability is lacking simply

because emissions contribute minimally to plaintiffs' injuries); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) ("Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern."); *Am Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 543 (6th Cir. 2004) (finding injury fairly traceable because affidavits stated that river had unpleasant odor, defendants exceeded effluent limitations on numerous occasions, and "these specific types of effluent discharges could cause conditions similar to that complained of"); *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County*, 268 F.3d 255, 263-64 (4th Cir. 2001) (Plaintiff "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged."). Murphy does not dispute that emissions of SO2, NOx, volatile organic compounds (VOCs) or hydrogen sulfide (H2S) can produce noxious odors or particulates in some concentration, and it admits to permit violations with respect to all of these compounds.

In *Comer*, property owners along the Mississippi Gulf Coast alleged injuries resulting from the defendants' emissions of

greenhouse gases. The defendants argued that their emissions contributed only minimally to climate change, and thus plaintiffs' alleged property damage was not fairly traceable to them. The Fifth Circuit disposed of the argument. It observed that "this Circuit has articulated the 'fairly traceable' test not as an inquiry into whether a defendants's pollutants are the sole cause of an injury but rather whether 'the pollutant causes or *contributes to* the kinds of injuries alleged by the plaintiffs.'" *Id.* Thus, the issue is not whether a particular compound from Murphy's stacks reached CCAM's members' olfactory nerves on a particular date. Instead, the issue is whether CCAM's emissions of NOx and SO2 contribute to foul odors.

In *Texans United*, the following evidence was sufficient to find that the odors plaintiffs complained of were "fairly traceable" to defendant's emissions: (1) the plaintiffs' testimony that they observed smoke from the defendant's plant in their neighborhood at the same time that they smelled chemical odors; (2) evidence that odors were present during admitted process upsets; and (3) evidence demonstrating that the defendant exceeded the federal limits on pollutant emissions at its plant nearly every month. *Texans United*, 207 F.3d at 792-93. Here, CCAM has made a similar showing. CCAM submitted declarations that its members often smell nauseating odors and that Murphy

frequently exceeds its emission limitations. CCAM also provided evidence indicating that odors were present on days when Murphy admittedly violated its permits. Kneale states that she wanted to play football with her son on August 16, 2008 but did not because of odors emanating from Murphy's refinery. (R. Doc. 30, Ex. O-1 ¶ 8.) She also took a photograph on that date of "huge flames coming from Murphy Oil." (*Id.*) Murphy admits to a significant violation of its LDEQ V3 Permit on August 16, 2008. Although Murphy asserts that NOx and SO2 odor thresholds were not in fact reached on August 16, 2008, it has not contradicted CCAM's showing that Murphy's NOx and SO2 emissions "contribute to" the foul odors and particulates disturbing CCAM's members. Accordingly, CCAM has demonstrated that its injuries are fairly traceable to Murphy's permit violations. *See Powell Duffryn*, 913 F.2d at 72-73 (finding plaintiffs' injury "fairly traceable" to defendant's actions when plaintiffs objected to water that had greasy or oily sheen, and defendant discharged oil and grease in excess of permit limitations); *Public Interest Research Group v. New Jersey Expressway Auth.*, 822 F. Supp. 174, 182 n.10 (D.N.J. 1992) (granting summary judgment on "fairly traceable" prong when plaintiffs showed defendant discharged pollutants in excess of permit limitations, and pollutants were of type that cause or contribute to types of injuries asserted).

18

### (c) Redressability

Murphy does not contest that CCAM's alleged injuries are redressable. Briefly, the Court finds that they are redressable.

First, Murphy admits that it exceeded its permit limitations 18 times between April 30, 2004 and January 13, 2009. (*See* R. Doc. 47 at 1.) Murphy also admits that it violated its permit after CCAM filed suit. (*Id.*) Accordingly, CCAM has demonstrated that Murphy repeatedly violates the Clean Air Act and that, unless some action is taken to prevent the illegal conduct, there is a real threat that such violations will continue to occur. *See O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) ("Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury."). An injunction is an appropriate remedy because it will abate or deter future illegal conduct. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998); *Powell Duffryn*, 913 F.2d at 73.

Civil penalties will likewise redress CCAM's injuries "to the extent that they encourage defendants to discontinue current violations and deter them from committing future ones." *Laidlaw*, 528 U.S. at 186. Although citizen plaintiffs do not have standing to seek civil penalties for "wholly past violations," *id*. at 188 (citing *Steel Co.*, 523 U.S. at 106-07), they do have

standing to seek penalties for violations that are ongoing and could continue into the future if not deterred. *Id*. at 188.

CCAM has demonstrated that Murphy frequently violated its permits by exceeding emission limitations and continued to violate them after plaintiffs filed suit. Murphy has not shown that it has changed the conditions that led to the violations to achieve full compliance. The summary judgment evidence suggests that Murphy could violate emission standards in the future. *See Texans United*, 207 F.3d at 794 (finding that when evidence suggested that an administrative settlement could not ensure that defendant would not commit further violations in the future, civil penalties would redress plaintiff's injuries by deterring the violations). Civil penalties carry a deterrent effect, which makes it likely that the penalties will redress CCAM's injuries by "abating current violations and preventing future ones." *Laidlaw*, 528 U.S. at 187. CCAM has standing to seek those penalties.

　　2.　　<u>CCAM seeks to protect interests germane to its purpose</u>
　　　　　<u>as an organization.</u>

The germaneness requirement helps ensure that an association, through its goals and purposes, will have a sufficient interest in the outcome of litigation to serve as the

defendant's natural adversary.  *See United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555-56 (1996); *see also Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58-59 (D.C. Cir. 1988).  An association's purpose thus may not be all-encompassing, but there is no requirement that it be narrow or specific.  *See, e.g.*, *Hosp. Council of Western Penn. v. City of Pittsburgh*, 949 F.2d 83, 88 (3d Cir. 1991) (finding hospital association that "represents, assists and speaks for its members in matters where joint action is appropriate or is designed to resolve common problems" had standing to sue to protect members' "financial interests"); *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998) ("[C]ourts have generally found the germaneness test to be undemanding."); *Humane Soc'y*, 840 F.2d at 58-59 (same; collecting authorities). The United States Supreme Court has specifically found that an association "'organized for the purpose of representing the interests of the owners and lessors of real property' in San Jose" had standing to attack the constitutionality of a rent control ordinance.  *Pennell v. City of San Jose*, 485 U.S. 1, 7 n.3 (1988).  Murphy does not seriously contend that this environmental enforcement action would not promote interests germane to CCAM's purpose, and the Court holds that it would.

CCAM's purpose is not meaningfully different from the

constitutionally sufficient purpose in *Pennell*. CCAM's complaint asserts that CCAM's purpose is to "protect the health, safety, environment, and quality of life of Meraux and the surrounding communities in St. Bernard Parish." (R. Doc. 19 ¶ 11.) Green, CCAM's president, testified at his deposition that CCAM is a "clean air and quality of life" organization. (R. Doc. 41, Ex. B at 53:23-24.) "Anything to improve the quality of life is what we're geared at. Our main focus at this time is the clean air because we feel that that is something that needs to be taken care of." (*Id.* at 54:3-7.) Dalier, a CCAM member since 2007, testified at his deposition that the organization's purpose is to "try to help the community out" by making it "[e]nvironmentally better." (R. Doc. 41, Ex. C at 94:5-7.) Kneale, CCAM's Secretary, declares that CCAM "seeks to restore homes and revitalize its community while preserving the integrity of St. Bernard Parish residential neighborhoods and improving its community's quality of life . . . . Concerned Citizens is committed to protecting the organization's members and other St. Bernard Parish residents from pollution coming from the surrounding petrochemical industry." (R. Doc. 30, Ex. O-1 ¶ 4.) CCAM's actively updated website documents CCAM's various concerns and activities, most of which relate to the environment in St. Bernard Parish. *See*

22

http://concernedcitizensaroundmurphy.blogspot.com.

The record thus indicates that CCAM is a vehicle for residents of St. Bernard Parish to address shared concerns, particularly environmental concerns, affecting their community. CCAM has vigorously pursued its members' environmental interests in a variety of contexts other than this litigation. (*See, e.g.*, R. Doc. 41, Ex. A at 34:21-35:10; 64:23-65:7; 75:19-76:9; 82:18-83:17; 159:21-161:22.) Reducing air pollution from Murphy's Meraux refinery is within the scope of reasons that concerned citizens around Murphy join CCAM. Although CCAM's articles of incorporation do not specify the scope of CCAM's corporate activities, CCAM has shown that it has a cogent purpose, that CCAM's members are commonly aware of this purpose, and that they voluntarily join CCAM because of this purpose. *Cf. Ermert v. Hartford Ins. Co.*, 559 So.2d 467, 474 (La. 1990) (finding that unincorporated associations may have separate legal personality when parties "conceive of their creation as a being or thing separate from themselves"). The Court finds that this lawsuit would vindicate CCAM's central purpose.

Murphy asserts that CCAM is simply too disorganized and informal to adequately represent its members' interests. Murphy argues that CCAM does not have clear standards for membership, and that CCAM's members cannot exert control over the

organization because CCAM has no clearly articulated governance structure and is not dependent on its members for finances.

Corporate formalities and formal membership structure are not constitutional requirements for associational standing. *See Hunt*, 432 U.S. at 344-45; *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828 (5th Cir. 1997). In determining whether the relationship between an association and its members is sufficiently close for constitutional standing, courts do not "exalt form over substance." *See Chevron*, 129 F.3d at 828. Thus, the association must demonstrate that the individuals it seeks to represent possess sufficient "indicia of membership." *Id.* (citing *Hunt*, 432 U.S. at 344-45). The purpose of the inquiry is to determine whether the association provides the means by which its members "express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 345. In *Chevron*, the Fifth Circuit found associational standing even though a non-profit environmental organization did not have formal membership requirements. 129 F.3d at 827. The court reasoned that the organization's members joined voluntarily, testified that they were members, elected the organization's governing body, and financed the organization's activities. 129 F.3d at 829. The court also reasoned that the "practice of considering all those who gave a donation, as well as those who

had a donation made in their name, to be members" was a "clearly articulated and understandable membership structure."  129 F.3d at 827, 829.

CCAM is similar to the organization in *Chevron*.  CCAM has a clear and understandable membership structure:  a person becomes a member through active, voluntary involvement, such as by attending neighborhood or strategy team meetings, providing input, canvassing, and networking.  (*See, e.g.*, R. Doc. 41, Ex. A-7 at 000115.)  CCAM has three or four dozen "active members" who regularly attend meetings, keep up to date on issues, meet with other members, and organize their community.  (*Id.* at 27:7-13; 28:15-23.)  New members join because they are "quite energized about meeting their neighbors."  (*Id.* at 31:12-15.) Although a formal list of members is not maintained (*id.* at 29:2-7), members are linked through informal networks (*id.* at 27:15-17; 28:5-12), and email contact lists (*id.* at 35:15-25).  Other than Green, who is currently rebuilding his home in Chalmette, CCAM has never had a member who was not a resident of St. Bernard Parish.  (*Id.* at 32:1-5).

Also like the organization in *Chevron*, CCAM operates under registered articles of incorporation, its members elect the organization's officers, and its members finance its activities. CCAM was incorporated on July 19, 2007 as a Louisiana non-profit

organization. (R. Doc. 41, Ex. A-1 at 20:10-11). CCAM's
articles of incorporation were signed by three officers. (*Id.* at
16:20-18:5; Ex. A-7 at 000123.) These officers were nominated
and voted on at two or three meetings beginning in May of 2007.
(*Id.* at 23:8-24:22.) In June and July of 2008, before CCAM's
renewal of its corporate registration, CCAM elected a new board
of directors. (*Id.* at 43:1-23, 45:7-21.) CCAM's decisions are
unanimous, and there has never been an objection to the election
of an officer. (*Id.* at 45:7-9.) CCAM has made a conscious
decision not to have a treasurer or bank account, but its members
"chip in" to cover expenses. (*Id.* at 38:4-39:6; 39:7-40:3;
49:10-50:20.) CCAM's members also "pay" for CCAM's activities
through their own volunteer efforts.

Again, the purpose of the indicia of membership test is to
help ensure that the association provides the means by which
represented individuals "express their collective views and
protect their collective interests." *Hunt*, 432 U.S. at 345.
CCAM satisfies this test because its members can participate
directly in making and implementing day-to-day decisions. CCAM's
meetings are often organized to respond to specific issues, such
as when the EPA wanted to test burn asbestos in a local landfill.
(*Id.* at 34:21-35:10.) Members organize meetings by word-of-
mouth, fliers, knocking on doors or making telephone calls. (*Id.*

at 26:9-11, 19-21.) They attend meetings "depending on their
family schedules or their interest in the particular issues that
they might think might be discussed at a meeting." (*Id.* at
28:15-19.) Approximately two dozen members regularly attended
meetings in 2007 (*id.* at 24:4-15), and meetings generally have
between 10-30 members in attendance (*id.* at 26:3-4; 64:20-21).

At one such meeting on June 24, 2008, CCAM voted to prepare
a letter of intent to sue Murphy. (R. Doc. 41, Ex. A3 at 000055-
56.) On the same day, Kneale and two other members, Kerry
Williams and Verna Lotz, were appointed "decision makers for
CCAM's actions with respect to legal counsel on the Clean Air Act
violations in our community" by a "Resolution for Clean Air
Campaign." (R. Doc. 41, Ex. A7 at 000119.) According to Dalier,
before CCAM ultimately decided to sue Murphy, there was
discussion at meetings, and the group reached a "consensus." (R.
Doc. 41, Ex. C at 114:13-22.) According to Green, CCAM's members
initially did not want to sue Murphy and decided to pursue
litigation only after two meetings and a vote. (R. Doc. 41, Ex.
B at 147:24-148:5.) This direct member participation helps
ensure that CCAM is representative of its members and has a
strong interest in the outcome of this litigation.

It is true that, as a general matter, the more informal an
association, the less likely it may be to express its members'

views or respond to their interests. *See Hunt*, 432 U.S. at 345.

Nevertheless, there is no indication in the record that CCAM has

any dissenting members with respect to this litigation or any

other issue. *See Int'l Union, United Auto. Aerospace and Agric.*

*Implement Workers of Am. v. Brock*, 477 U.S. 274, 289-90 (1986)

(holding that mere possibility that association could bring

litigation without authorization or input of all members does not

defeat association's standing); *Nat'l Maritime Union of Am. v.*

*Commander, Military Sealift Command*, 824 F.2d 1228, 1232-34 (D.C.

Cir. 1987) (holding that "mere fact of conflicting interests

among members of an association does not of itself defeat the

association's standing"). Nor is there any indication that CCAM

is unresponsive to its members. Indeed, CCAM could not operate

without the input, participation and support of its member-

volunteers. CCAM's decisions are made by consensus, its officers

are elected, and voting is open to all members. Because CCAM has

no external financing, it is entirely dependent on members'

contributions, volunteer efforts and continued good-will. Some

of CCAM's members may be more or less active than others, but

that is their choice, and nothing in the record indicates that

their input is ignored when they choose to give it. In fact, the

record is directly to the contrary. That members' names are not

memorialized on a proverbial membership role does not mean that

members do not voluntarily join and participate in CCAM.  Murphy argues that CCAM has no particular expertise to justify associational standing, but the record suggests that CCAM has considerable knowledge about local environmental concerns and conditions.  In sum, the picture painted of CCAM is not an organization removed from and unresponsive to its individual members, but rather an organization that is member driven.  These members have now decided that it is in their collective interest to seek redress for violations of the Clean Air Act.  Because the Court's analysis is not formalistic, CCAM's constitutional standing does not turn on the formality of its procedures.

Murphy does not cite any authority that warrants a different conclusion.  Murphy relies on *American Legal Foundation (ALF) v. F.C.C.* for the proposition that an organization does not have standing if it serves "no discrete, stable group of persons with a definable set of common interests."  808 F.2d 84, 90 (D.C. Cir. 1987).  In *ALF*, a nonprofit "media law center" attempted to bring suit on behalf of "all members of the public who regularly watch ABC News (and other network news broadcasts)."  *Id.* at 87-88. The organization did not purport to have members, but rather "supporters."  *Id.* at 89.  The court found that the organization did not have associational standing because, *inter alia*, its supporters did not play "any role" in selecting its leadership,

guiding its activities, or financing its activities. *Id.* at 90.
The court reasoned that because the ALF lacked "a definable
membership body whose resources and wishes help steer the
organization's course, ALF 'may have reasons for instituting a
suit . . . other than to assert rights of its [supporters]' . . .
." *Id.* For the reasons already discussed, *ALF* has no
application to this case. CCAM has active members who select its
leadership, guide its activities, and finance and implement those
activities. Moreover, there is no evidence in the record that
CCAM has any dissenting members, or that CCAM has reasons for
instituting this suit other than asserting its members'
interests. To the contrary, CCAM's decision to bring this
litigation was considered and approved by CCAM's members over
multiple meetings. Lastly, CCAM's members comprise a discrete,
stable group of persons with a definable set of common interests.
Namely, they are St. Bernard Parish residents or homeowners who
seek to address environmental concerns, particularly air
pollution, in their community. CCAM's members are not analogous
to nationwide viewers of ABC programming.

For similar reasons, *Health Research Group (HRG) v. Kennedy*
has no application to this case. 82 F.R.D. 21 (D.C. Cir. 1979).
In *HRG,* an organization sought to assert claims of thousands of
"contributors" and "supporters." *Id.* at 24. The organization

itself had no members or direct contributors, and it was funded primarily by a separate umbrella organization. *Id.* The umbrella organization had "no continuing relationship" with its contributors and supporters, who had "absolutely no direct control" over either organization. *Id.* at 27. The organizations at issue in *HRG* are unlike CCAM because CCAM has a continuing relationship with its members, and because CCAM's members exercise direct control over CCAM's decisions and activities.

Murphy relies on *Association for Retarded Citizens of Dallas (ARCD) v. Dallas County Mental Health & Mental Retardation Center Board of Trustees* for the proposition that CCAM's members do not exercise sufficient control over CCAM. 19 F.3d 241 (5th Cir. 1994). In *ARCD*, the Fifth Circuit briefly stated that an organization did not have associational standing because the person on behalf of whom claims were asserted did not purport to be a member of the organization, and because the organization's "clients" were "unable to participate in and guide the organization's efforts." *Id.* at 244. Here, CCAM is asserting claims on behalf of its members, and these members are able to participate in and guide CCAM's efforts.

Lastly, Murphy relies on *Washington Legal Foundation (WLF) v. Leavitt* for its claim that CCAM does not have a sufficiently defined purpose or membership structure. 477 F. Supp. 2d 202

31

(D.D.C. 2007). In *WLF*, a public interest law firm sought to raise claims on behalf of Medicare Part D subscribers. *Id.* at 206. The organization had over 5,000 "mailing list" members, and its stated purpose was "to pursue freedom, justice, and free enterprise through litigation." *Id.* at 212. The court found that the organization was unlikely to represent its purported members because they did not play "any role" in selecting the organization's leadership, guiding its activities, financing those activities, or determining whether to pursue litigation in the first place. *Id.* at 209-211. *WLF* is inapposite because CCAM is controlled by a discrete number of active members, and these members deliberated and then chose to initiate this litigation.

For all of the reasons stated, the Court finds that CCAM seeks to protect interests germane to its purpose as an organization.


3.  <u>Neither the claim asserted, nor the relief requested,</u>
    <u>requires the participation of CCAM's members.</u>

Murphy argues that CCAM lacks standing because it is Kneale's *alter ego* and therefore requires her participation in this litigation. This argument misses the point. The purpose of the third associational standing requirement is to avoid cases in which the fact and extent of injury requires members to submit

32

individualized proof. *See United Food*, 517 U.S. at 555-56; *see also Brock*, 477 U.S. at 287. In such cases, individual members typically should assert their own claims. *See id.; see also Warth v. Seldin*, 422 U.S. 490, 515 (1975). Thus, an organization of construction firms may not seek damages for its members' lost profits and business. *Id.* Suits for injunctive relief, however, do not involve individualized proof of damages. *See United Food*, 517 U.S. at 546. In this case, neither the claims CCAM raises nor the relief it seeks requires individualized proof from Kneale or any of its other members. CCAM does not seek to recover damages for its members' injuries. An injunction is not specific to any of CCAM's members, and an assessment of civil penalties under 42 U.S.C. § 7413(e) is paid to the government. If Murphy were correct that the mere involvement of an association's member in litigation voids associational standing, almost no association could ever bring suit on its members' behalf.

For the reasons stated, the Court finds that CCAM has associational standing to bring this lawsuit. CCAM's motion for summary judgment on the issue of standing is GRANTED, and Murphy's motion is DENIED.

## B.   Liability

Louisiana law prohibits any discharge of "air contaminants

. . . in violation of regulations of the secretary or the terms of any permit, license, or variance." La. Rev. Stat. Ann. § 30:2057. Louisiana regulations specifically define an "unauthorized discharge" as "a continuous, intermittent, or one-time discharge, whether intentional or unintentional, anticipated or unanticipated, from any permitted or unpermitted source which is in contravention of any provision of the Louisiana Environmental Quality Act (R.S 30:2001, *et seq.*) or of any permit." La. Admin. Code tit. 33:I § 3905. Whenever Murphy has an "unauthorized discharge," it must file a written report with the LDEQ. La. Admin. Code tit. 33:III § 927. In this report, Murphy must inform LDEQ whether its unauthorized discharge was "preventable." La. Admin. Code tit. 33:I § 3925(B)(13). Although a state's implementation plan may provide an affirmative defense for permit violations caused by circumstances beyond the control of the owner or operator, the defense applies only to violations caused by "sudden and unreasonably unforeseeable events beyond the control of the owner or operator, including acts of God . . . that cause[] the source . . . to exceed a technology-based emissions limitation under the permit due to unavoidable increases in emissions attributable to the situation." La. Admin. Code tit. 33:III § 507(J)(1), (2).

CCAM moves for summary judgment on the issue of Murphy's

liability for 24 alleged unauthorized discharges.

1.    Undisputed permit violations

Murphy does not oppose plaintiffs' motion for summary
judgment on liability with respect to the following discharges:

1.   43 pounds of H2S from the #2 SRU Incinerator on April
     30, 2004;[2]

2.   243 pounds of SO2 from the #2 SRU Incinerator on April
     30, 2004;

3.   319 pounds of SO2 from the #3 SRU Incinerator on June
     28, 2006;

4.   29,513 pounds of SO2 from the South Flare on June 28,
     2006;

5.   1,282 pounds of SO2 from the North Flare on July 1,
     2006;

6.   2,755 pounds of SO2 from the North Flare on July 10,
     2006;

7.   205 pounds of SO2 from the #2 SRU Incinerator on July
     10, 2006;

8.   501 pounds of SO2 from the North Flare on August 6,
     2006;

9.   1,031 pounds of SO2 from the #3 SRU Incinerator on
     August 16, 2007;

10.  261 pounds of SO2 from the North Flare on August 16,
     2007;

11.  51 pounds of H2S from the #3 SRU Incinerator on January
     20, 2008;

_____

[2]Murphy withdrew its opposition to this discharge in its
supplemental briefing.  (*See* R. Doc. 58 at 4.)

12.  43 pounds of NOx from the North Flare on January 29, 2008;

13.  308 pounds of VOCs from the North Flare on January 29, 2008;

14.  447 pounds of SO2 from the North Flare on August 20, 2008;

15.  39 pounds of SO2 from the #2 SRU Incinerator on August 20, 2008;

16.  6,251 pounds of SO2 from the North Flare on August 16, 2008;[3]

17.  3,160 pounds of SO2 from the South Flare on August 16, 2008;

18.  1,700 pounds SO2 from the #3 SRU Incinerator on August 19, 2008; and

19.  215 pounds of SO2 from the North Flare on January 13, 2009.

Murphy has filed Unauthorized Discharge Notification Reports with the LDEQ admitting that these 19 discharges occurred and were preventable. (*See* R. Doc. 30, Exs. A-J, K, N.)  The unauthorized discharge reports demonstrate that Murphy violated emission standards or limitations promulgated under the Clean Air Act and Louisiana's SIP on these 19 occasions.  *See Unitek Envtl. Servs., Inc. v. Hawaiian Cement*, No. 95-00723SPK, 1997 U.S. Dist. Lexis 19261, at *10-11 (D. Haw. Aug. 7, 1997) (defendant's permit

_____

[3] Murphy separately released 2,251 and 4,000 pounds of SO2 from its North Flare on August 16, 2008.  (*See* R. Doc. 30, Ex. J.)

applications acknowledging that it was not in compliance with national and state air quality standards were "credible evidence" of Clean Air Act violations); *Sierra Club v. Pub. Serv. Co. of Colo.*, 894 F. Supp. 1455, 1458 (D. Colo. 1995) (defendant's continuous emissions data and reports that reflected emissions exceeding the applicable limit numerous times over five years were competent evidence of ongoing emissions violations); *Friends of the Earth v. Potomac Elec. Power Co.*, 419 F. Supp. 528, 533 (D.D.C. 1976) (finding no issue of fact as to the existence of 24 emissions violations when those incidents were reflected in defendant's own records); *see also United States v. Aluminum Co. of Am.*, 824 F. Supp. 640, 648-49 (E.D. Tex. 1993) (defendant's discharge monitoring reports, which reported violations of defendant's Clean Water Act permit, were "virtually unassailable" admissions that the violations occurred). Because CCAM has pointed to evidence indicating that Murphy unlawfully violated its LDEQ Permits on these 19 occasions, Murphy was required either to counter with sufficient evidence of its own, or show CCAM's evidence is "so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of" CCAM. *Int'l Shortstop*, 939 F.2d at 1265. Murphy has done neither. Moreover, Murphy has not asserted the "malfunction" defense with respect to these violations and, in any event, it could not

because it admitted in its reports that these 18 unauthorized discharges were "preventable." CCAM's motion for summary judgment therefore is GRANTED with respect to these 19 violations.

      2.   <u>Disputed permit violations</u>

Murphy contests whether the following five alleged emissions were unlawful:

1.    4,000 pounds of SO2 from the North Flare on August 20, 2008;

2.    10,698 pounds of SO2 from the North Flare between August 16-20, 2008;

3.    1 pound of Benzene from Tank 300-2 on November 22, 2008;

4.    500 pounds of VOCs from Tank 300-2 on November 22, 2008;

5.    235 pounds of SO2 from the South Flare on January 9, 2009.

      **(a)   Emission of 4,000 pounds of SO2 from the North Flare on August 20, 2008**

CCAM initially alleged that Murphy violated its LDEQ V3 Permit by discharging 4,000 pounds of SO2 from its North Flare on August 16, 2008. Murphy points out that this allegation double counts the SO2 discharge already included in the undisputed discharge #16 listed above. CCAM admits it was in error, and now

38

claims that Murphy violated its permit by emitting 4,000 pounds of SO2 from its North Flare on August 20, 2008.

The evidence supports CCAM's contention that Murphy discharged 4,000 pounds of SO2 from its North Flare on August 20, 2008 (*see* R. Doc. 30, Ex. J), and that this amount exceeds its LDEQ V3 Permit limit. *See* LDEQ V3 Permit at 57. Because CCAM has pointed to evidence indicating that Murphy unlawfully violated its LDEQ V3 Permit, Murphy must either counter with sufficient evidence of its own, or show CCAM's evidence is "so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of" CCAM. *Int'l Shortstop*, 939 F.2d at 1265. It has not done so. Moreover, Murphy has not asserted the "malfunction" defense with respect to this discharge and, in any event, it could not because it admitted in its Unauthorized Discharge Notification Report that the discharge was "preventable." CCAM's motion for summary judgment therefore is GRANTED with respect to its claim that Murphy violated its permit by emitting 4,000 pounds of SO2 from its North Flare on August 20, 2008.

### **(b) Emission of 10,698 pounds of SO2 from the North Flare between August 16-20, 2008**

CCAM initially claimed that Murphy violated its yearly North

Flare permit limit for SO2 on August 16, 2008.  It has revised this claim and now asserts that Murphy violated its yearly permit limit for SO2 between August 16 through 20, 2008.  To arrive at this conclusion, CCAM has added the four North Flare emissions disclosed on Murphy's Unauthorized Discharge Notification Report dated December 30, 2008.  (*See* R. Doc. 30, Ex. J.)  The record supports CCAM's revised assertion that Murphy discharged 10,698 pounds of SO2 from its North Flare between August 16 and August 20, 2008 (*see id.*), and that this amount exceeds its yearly limitation, *see* LDEQ V3 Permit at 57 (EQT 0035).  Murphy has not countered this evidence with sufficient evidence of its own, or shown that CCAM's evidence is "so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of" CCAM. *Int'l Shortstop*, 939 F.2d at 1265.  Rather, Murphy asserts that these discharges are covered by the "malfunction" defense. Specifically, Murphy asserts that its annual permit limitations apply only to emissions associated with normal operations and do not apply to emissions resulting from upsets, shutdowns, startups or malfunctions.  (*See* R. Doc. 47, Ex. A ¶ 5.)  Murphy states without explanation that it reported its SO2 emissions as "Upsets/Emergencies" in its "2008 ERIC report," and therefore these emissions should not count toward its yearly permit limit.

In Louisiana, a defendant may assert an affirmative

"malfunction" defense with respect to permit violations caused by "sudden and reasonably unforeseeable events beyond the control of the owner or operator, including acts of God . . . that cause the source . . . to exceed a technology-based emissions limitation under the permit due to unavoidable increases in emissions attributable to the situation." La. Admin. Code tit. 33:III § 507(J)(1), (2). To establish the affirmative defense, the defendant must demonstrate "through properly signed, contemporaneous operating logs or other relevant evidence that: (a) an upset occurred and that the owner or operator can identify the cause(s) of the upset; (b) the permitted facility was at the time being properly operated; (c) during the period of the upset the operator took all reasonable steps to minimize levels of emissions that exceeded the emissions standards; and (d) the owner or operator properly notified the permitting authority. La. Admin. Code tit. 33:III § 507(J)(2)(a)-(d). The defendant bears the burden of proof. La. Admin. Code tit. 33:III § 507(J)(3).

Murphy has failed to create a triable issue as to the malfunction defense for several reasons. First, Murphy's conclusory declaration that it reported the SO2 emissions as "Upsets/Emergencies" (*see* R. Doc. 47, Ex. A ¶ 5) does not address the stringent regulatory requirements of the malfunction defense,

and the declaration therefore is insufficient to carry Murphy's burden at summary judgment. *See, e.g.*, *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). Second, Murphy has not attached its "2008 ERIC report," so the Court cannot evaluate Murphy's claim that the SO2 emissions allegedly identified as "Upsets/Emergencies" meet the requirements of the malfunction defense. Third, Murphy's argument is flatly contradicted by its contemporaneous Unauthorized Discharge Notification Report dated December 30, 2008, which states that the SO2 discharges on August 16 and 20, 2008 were "preventable." (*See* R. Doc. 30, Ex. J.) Notably, Murphy does not address or attempt to distinguish this contemporaneous report.

For these reasons, Murphy has failed to create a genuine issue of material fact that its discharges of SO2 on August 16 and 20, 2008 satisfy the conditions of the malfunction defense. Accordingly, CCAM's motion for summary judgment is GRANTED with respect its claim that Murphy violated its yearly permit limit for SO2 between August 16 through 20, 2008.

### (c) **Emission of 1 pound of Benzene and 500 pounds of VOCs from Tank 300-2 on November 22, 2008**

CCAM claims that Murphy violated its LDEQ V3 Permit by discharging 1 pound of Benzene and 500 pounds of VOCs from Tank

300-2 on November 22, 2008.  Murphy does not contest that these discharges exceeded its permit limitations, but it claims that they were not unlawful because they resulted from a malfunction. Murphy also asserts that the discharges cannot recur, and therefore the issue is moot.

Murphy has raised a genuine issues of material fact as to whether its emissions of 1 pound of Benzene and 500 pounds of VOCs from Tank 300-2 on November 22, 2008 meet the regulatory requirements of the malfunction defense.  *See* La. Admin. Code tit. 33:III § 507(J)(2)(a)-(d).  Murphy has submitted an affidavit of D. Keith Baugher dated November 24, 2009 explaining that: (a) the emissions were caused by a rare malfunction of a brand new oil tank; (b) the oil tank had been tested and placed into service in accordance with industry standards, and contemporaneous records indicate that no human error was involved; (c) Murphy took steps to expeditiously remove the contamination and prevent future leaks; and (d) Murphy timely notified its permitting authority of its excess emissions.  (R. Doc. 47, Ex. B.)  This evidence is sufficient to create triable issues of fact as to whether Murphy has satisfied the elements of the malfunction defense.  CCAM's motion for summary judgment is therefore DENIED with respect to its claims that Murphy violated its LDEQ V3 Permit by discharging 1 pound of Benzene and 500

43

pounds of VOCs from Tank 300-2 on November 22, 2008.

### (d) Emission of 235 pounds of SO2 from the South Flare on January 9, 2009.

CCAM claims that Murphy violated its LDEQ V3 Permit by discharging 235 pounds of SO2 from the South Flare on January 9, 2009. Again, Murphy does not contest that this discharge exceeds its permit limit, but it claims that the discharge was not unlawful because it resulted from a malfunction.

Murphy has raised genuine issues of material fact as to whether its emission of 235 pounds of SO2 on January 9, 2009 meets the regulatory requirements of the malfunction defense. *See* La. Admin. Code tit. 33:III § 507(J)(2)(a)-(d). The supplemental affidavit of D. Keith Baugher dated December 22, 2009 explains that: (a) the upset was caused by a short at an Entergy substation supplying electricity to the refinery; (b) contemporaneous records indicate that Murphy's refinery was being properly operated at the time of the upset; (c) during the upset, Murphy took reasonable steps to limit the duration of the excess emissions and avoid catastrophic explosion; and (d) Murphy timely notified its permitting authority of its excess emissions. His affidavit is sufficient to create triable issues of fact as to whether Murphy has satisfied the elements of the malfunction

defense.  CCAM's motion for summary judgment is therefore DENIED with respect to its claim that Murphy violated its LDEQ V3 Permit by discharging 235 pounds of SO2 from the South Flare on January 9, 2009.

## IV. CONCLUSION

For the reasons stated, the Court GRANTS CCAM's partial motion for summary judgment on standing to bring this action under the Clean Air Act.  The Court also GRANTS CCAM's motion for summary judgment as to Murphy's liability with respect to the following incidents:

1.  43 pounds of H2S from the #2 SRU Incinerator on April 30, 2004;

2.  243 pounds of SO2 from the #2 SRU Incinerator on April 30, 2004;

3.  319 pounds of SO2 from the #3 SRU Incinerator on June 28, 2006;

4.  29,513 pounds of SO2 from the South Flare on June 28, 2006;

5.  1,282 pounds of SO2 from the North Flare on July 1, 2006;

6.  2,755 pounds of SO2 from the North Flare on July 10, 2006;

7.  205 pounds of SO2 from the #2 SRU Incinerator on July 10, 2006;

8.  501 pounds of SO2 from the North Flare on August 6, 2006;

9.    1,031 pounds of SO2 from the #3 SRU Incinerator on
      August 16, 2007;

10.   261 pounds of SO2 from the North Flare on August 16,
      2007;

11.   51 pounds of H2S from the #3 SRU Incinerator on January
      20, 2008;

11.   43 pounds of NOx from the North Flare on January 29,
      2008;

13.   308 pounds of VOCs from the North Flare on January 29,
      2008;

14.   447 pounds of SO2 from the North Flare on August 20,
      2008;

15.   39 pounds of SO2 from the #2 SRU Incinerator on August
      20, 2008;

16.   6,251 pounds of SO2 from the North Flare on August 16,
      2008;

17.   3,160 pounds of SO2 from the South Flare on August 16,
      2008; and

18.   4,000 pounds of SO2 from the North Flare on August 20,
      2008;

19.   10,698 pounds of SO2 from the North Flare between
      August 16-20, 2008;

20.   1,700 pounds SO2 from the #3 SRU Incinerator on August
      19, 2008

21.   215 pounds of SO2 from the North Flare on January 13,
      2009.

The Court DENIES CCAM's motion for summary judgment as to Murphy's liability with respect to the following incidents:

1. 1 pound of Benzene from Tank 300-2 on November 22, 2008;

2. 500 pounds of VOCs from Tank 300-2 on November 22, 2008;

3. 235 pounds of SO2 from the South Flare on January 9, 2009.

New Orleans, Louisiana, this 3rd day of February, 2010.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE